UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X
HONERO FUND I, LLC,                                    :
                                                       :
                              Plaintiff,               :
                                                       :
              - against -                              :   15 Civ. 1553 (TPG)
                                                       :
THE REPUBLIC OF ARGENTINA,                             :
                                                       :
                              Defendant.               :
------------------------------------------------------------------------ X
TRINITY INVESTMENTS LIMITED,                           :
                                                       :
                              Plaintiff,               :
                                                       :
              - against -                              :   15 Civ. 1588 (TPG)
                                                       :
THE REPUBLIC OF ARGENTINA,                             :
                                                       :
                              Defendant.               :
------------------------------------------------------------------------ X

**MEMORANDUM OF LAW OF THE REPUBLIC OF ARGENTINA IN OPPOSITION
TO PLAINTIFFS HONERO FUND I, LLC'S AND TRINITY INVESTMENT LIMITED'S
"ME TOO" MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ......................................................................... 1

BACKGROUND ............................................................................................... 5

    A.    The Court Grants *Pari Passu* Relief In Five Pre-Judgment Cases ...................... 5

    B.    Plaintiffs Honero And Trinity File "Me Too" Motions For Partial Summary Judgment, Joining More Than 500 Plaintiffs Who Filed Similar Motions In February And March 2015 ................................................ 11

ARGUMENT ................................................................................................... 14

    I.    PLAINTIFFS' MOTIONS ARE PREMATURE .................................... 14

    II.    TRINITY'S MOTION MUST BE DENIED BECAUSE TRINITY HAS NOT ADEQUATELY DEMONSTRATED ITS PURPORTED OWNERSHIP OF INTERESTS IN 1994 FAA BONDS ................................................................................... 16

    III.    PLAINTIFFS ARE NOT OTHERWISE ENTITLED TO THE SUMMARY JUDGMENT ORDERS THEY SEEK ............................... 16

        A.    Plaintiffs' Motions Must Be Denied To The Extent They Exceed The Second Circuit's Prior Rulings In This Litigation ....................................................................... 16

        B.    The Republic's Arguments Are Not Barred By Collateral Estoppel ......................................................................... 19

        C.    The Republic Has Not Breached The *Pari Passu* Clause As It Has Long Been Understood By The Market ........................... 19

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bryant v. New York State Educ. Dep't,*
692 F.3d 202 (2d Cir. 2012) ..................................................................................... 24

*Cole v. Fischer,*
No. 08 Civ. 699, 2009 WL 2258341 (W.D.N.Y. 2009) ..................................................... 14

*Cusamano v. Alexander,*
691 F. Supp. 2d 312 (N.D.N.Y. 2009) .................................................................. 14

*Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.,*
23 F. Supp. 3d 173 (S.D.N.Y. 2014) .................................................................. 14

*Jim Beam Brands Co. v. Beamish & Crawford Ltd.,*
937 F.2d 729 (2d Cir. 1991) .................................................................. 19

*Johnson v. Holder,*
564 F.3d 95 (2d Cir. 2009) .................................................................. 25

*NML Capital, Ltd. v. Republic of Argentina,*
699 F.3d 246 (2d Cir. 2012) .................................................................. *passim*

*NML Capital, Ltd. v. Republic of Argentina,*
727 F.3d 230 (2d Cir. 2013) .................................................................. 11

*NML Capital Ltd., v. Republic of Argentina,*
No. 08 Civ. 06978 (TPG), 2011 WL 9522565 (S.D.N.Y. Dec. 7, 2011) .......................... 9

*Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.,*
38 F.3d 627 (2d Cir. 1994).................................................................. 16

*Silver Star Enterprises, Inc. v. M/V SARAMACCA,*
No. Civ. A. 92-1297, 1992 WL 348420 (E.D. La. Nov. 18, 1992) .................................. 15

*Silver Star Enterprises, Inc. v. Suriname,*
55 F.3d 633 (5th Cir. 1995) .................................................................. 15

*Vivenzio v. City of Syracuse,*
611 F.3d 98 (2d Cir. 2010) .................................................................. 14

**Rules and Statutes**

28 U.S.C. § 1608(d) .................................................................. 15

Fed. R. Civ. P. 56.................................................................. 14, 16

Fed. R. Evid. 801(c) ................................................................................................ 16

Fed. R. Evid. 803(6) ............................................................................................... 16

**Other Authorities**

Republic of Argentina, Annual Report (Form 18-K) (Oct. 1, 2010), *available at*
https://www.sec.gov/Archives/edgar/data/914021/000090342309000873/roa-
18k_1026.htm ......................................................................................................... 8

Mark Weidemaier, et al. *Origin Myths, Contracts, and the Hunt for Pari Passu,* 38 Law
& Soc. Inquiry 72 (2013) ........................................................................................ 5

Defendant the Republic of Argentina (the "Republic") submits this memorandum of law in opposition to the motions for partial summary judgment of plaintiffs Honero Fund I, LLC ("Honero") and Trinity Investments Limited ("Trinity"), dated March 10, 2015, seeking relief in connection with the *pari passu* clause.[1]  Plaintiffs purport to hold an additional $9.6 million of claims, on top of the at least $5.4 billion of judgments and claims purportedly held by the 526 other "me too" plaintiffs who recently filed similar motions, and the $1.6 billion claimed by plaintiffs that have already obtained *pari passu* injunctions.

## PRELIMINARY STATEMENT

The existing *pari passu* injunctions have had their intended effect of blocking contractually owed interest payments to the holders of some $28 billion in outstanding principal amount of restructured Republic indebtedness.  That these holders of restructured debt (the "Exchange Bondholders") – who constitute approximately 92% of the debt that originally defaulted – had accepted meaningful haircuts, consistent with U.S. policy and international practice, because they recognized the Republic's inability to pay them in full, mattered not to the holdout creditors who chose not to accept the deal:  their whole strategy was to free ride on the Exchange Bondholders' forbearance[2] in the hope of garnering windfall profits for themselves. Nor did it matter to the holdout creditors that the injunctions, in unprecedented fashion, blocked these innocent third parties from receiving funds that they legally own, unless and until the holdouts received these windfall profits:  that was the whole point of the exercise.  Apparently of

---

[1] Like the 37 motions for partial summary judgment filed by the 526 other "me too" plaintiffs between February 3, 2015 and March 3, 2015, Honero and Trinity rely entirely on the Memorandum of Law filed by NML Capital, Ltd ("NML") on February 3, 2015 in 14 Civ. 8601 (TPG) (S.D.N.Y.) ("Pls. Br.").  *See*  Mem. of Law in Supp. of Mot. for Partial Summ. J. at 2, *Honero Fund I, LLC v. Republic of Argentina*, No. 15 Civ. 1553 (TPG) (S.D.N.Y. Mar. 10, 2015), ECF No. 7; Mem. of Law in Supp. of Mot. for Partial Summ. J. at 2, *Trinity Investments Limited v. Republic of Argentina*, No. 15 Civ. 1588 (TPG) (S.D.N.Y. Mar. 10, 2015), ECF No. 8.

[2] As it turned out, the Exchange Bondholders, because of the GDP-linked warrants that were part of the exchange, actually received a good financial return under the difficult circumstances Argentina faced.

least concern to the holdouts was the fact that the Republic had restructured its unsustainable

debt, not based on some illegitimate whim, but as the only way out of the worst financial

collapse in its modern history:  for the holdouts, that human and social catastrophe was just an

opportunity to make more money.  That the Republic could not pay in full, and had tried its best

to resolve the claims against it as equitably as possible, *i.e.*, by not preferring one creditor to

another – and had settled the claims, not only of approximately 92% of its bondholders, but also

of ICSID claimants and official sector creditors like the International Monetary Fund ("IMF")

and Paris Club[3] that held billions of dollars of more debt – was contemptuously dismissed by the

holdout creditors as the protestations of a "rogue" and "deadbeat."

        The holdout creditors, in short, adroitly constructed a counterfactual narrative that

ignored Argentina's financial condition, universally accepted norms of sovereign debt

restructuring, and the reality that no restructuring, including Argentina's, ever could be

accomplished if each and every holdout was contractually guaranteed the right to veto the

restructuring absent full payment of its claims.  Quite simply, there would have been no

restructured debt on which to enjoin payment, because there would have been no successful

restructuring, if any Exchange Bondholder had seriously believed that the 1994 Fiscal Agency

Agreement ("1994 FAA") under which it held its bonds would have been construed after the fact

to grant such a veto right to any of its fellow bondholders.  In effect, the Court ruled that neither

the borrower, nor approximately 92% of the lenders, properly understood their own agreement,

and instead adopted a counterintuitive and unworkable interpretation that the financial markets

---

[3] In May 2014, the Republic and the Paris Club reached an agreement to resolve the outstanding, defaulted Republic debt that the Paris Club held.  Notably, even the holdout creditors have never suggested that this settlement, or payments under it, violated or could violate the *pari passu* clause in the 1994 FAA, demonstrating the entirely ad hoc, artificial nature of the reading of the clause that they contrived.

had never before followed and that no New York court had ever sanctioned, in order to achieve a result that accomplished only further harm.

Argentina warned that the existing *pari passu* injunctions previously sought by a purported $1.6 billion of holdout claims would not magically "resolve" the Argentine debt litigation, as those plaintiffs, playing upon the Court's desire for closure, disingenuously told the Court would be the result if it granted those injunctions. On the contrary, Argentina told the Court that the debt litigation would only multiply. And that is exactly what has happened.

As predicted by the Republic, the floodgates have opened: the original plaintiffs themselves moved for "additional" *pari passu* relief, and over 500 other plaintiffs, including Honero and Trinity here, have now joined in as "me toos." *See* Pre-Judgment Plaintiffs Chart (Ex. A); Post-Judgment Plaintiffs Chart (Ex. B). Their demand is clear – to increase by over $5.4 billion – in addition to the $1.6 billion at issue in the existing injunctions – the amount that must be paid to them before any restructured debt holder can receive any payment of scheduled interest. Not only would these injunctions be impossible to comply with, but the flood of "me toos" demonstrates that if the Court grants these motions, the numbers will only increase still further (there are $10 billion in judgments and claims in this Court alone), making compliance even more unattainable. No country the size of Argentina could afford to pay that amount without subjecting its economy and citizens to an unacceptable degree of catastrophic risk.

It is for that reason, as the IMF has recently observed, that the global marketplace has expressed great concern that the reading of the *pari passu* clause adopted in this litigation will have a destructive effect on the sovereign debt restructuring process generally, on top of the harm that it is inflicting on the Republic and various third parties, including the Exchange Bondholders. That concern is echoed by the United Nations, which has observed that

the misreading of the *pari passu* clause threatens the capacity of governments to fulfill their human rights obligations, particularly economic, social, and cultural rights, as well as the right to development.  The holdout creditors' disingenuous earlier assurances that the injunctions would not cause more harm than good have been shown to be wrong, both in the Argentina litigation and in their broader impact on the international financial system.

Now is the time for the Court to draw the line on the holdout creditors' extravagant demands.  The Court should reject plaintiffs' meritless attempts here to exacerbate the situation further by entering yet more damaging orders.

*First*, plaintiffs' motions should be denied as premature because the 60 days afforded to the Republic under the Foreign Sovereign Immunities Act (the "FSIA") to file a pleading responsive to plaintiffs' complaints has not yet expired.  Under that statute, the Republic has over five more weeks – until May 4, 2015 – to file its responses.  This is not a technicality, but a substantive protection that Congress put in place for all foreign sovereigns, including the Republic, and plaintiffs may not circumvent it here by rushing to obtain judgments on the merits.  The Court should follow the consistent line of authority denying such premature motions in both the private and sovereign context and reject plaintiffs' motions.

*Second*, Trinity's motion must be denied for the additional reason that Trinity has not submitted adequate proof that it owns the bonds at issue in its action.  In support of its claim for over $5.4 million in principal amount of defaulted debt, Trinity submits only an inadmissible bank custodial letter.  Under the Federal Rules of Evidence and the case law applying it, plaintiffs' "proof" constitutes hearsay, because it was not prepared in the ordinary course by the issuing bank, and accordingly – consistent with the practice in this litigation – summary judgment may not be entered.

4

*Third*, plaintiffs are otherwise not entitled to the relief they seek because they improperly ask the Court to exceed the scope of the Second Circuit's reading of the *pari passu* clause by adopting an interpretation of the provision that both this Court and the Second Circuit previously refused to accept (the Republic also respectfully maintains that no breach occurred at all under the correct reading of that provision).  Contrary to plaintiffs' contention, the Republic is not barred by collateral estoppel from opposing plaintiffs' motions on that ground, as no court in this proceeding has adopted the erroneous reading of the *pari passu* clause they now put forth.

Plaintiffs' motions must be denied.

## BACKGROUND

### A.    The Court Grants *Pari Passu* Relief In Five Pre-Judgment Cases

The October 19, 1994 Fiscal Agency Agreement ("1994 FAA") governing the series of bonds in which plaintiffs purport to hold interests contains a standard clause found in sovereign (and non-sovereign) indebtedness known as the *pari passu* clause.  *See* 1994 FAA (Ex. U) ¶ 1(c).  That provision states:

> The Securities [issued under the 1994 FAA] will constitute . . . direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank *pari passu* and without any preference among themselves.  The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness (as defined in this Agreement).

*Id.*

This is a boilerplate provision that appears in virtually all modern sovereign bonds, often with language that is materially identical to that here.  Mark Weidemaier, et al. *Origin Myths, Contracts, and the Hunt for Pari Passu,* 38 Law & Soc. Inquiry 72, 84, 101-02 (2013).  The first sentence of the clause prohibits the Republic from discriminating "among" the bonds issued pursuant to the 1994 FAA ("1994 FAA Bonds") "themselves" and, as NML has

5

noted, "is not at issue" in these *pari passu* proceedings.  Corrected Joint Resp. Br. of

Pls.-Appellees, NML Capital, Ltd., Olifant Fund, Ltd., and Varela, et al. at 8, *NML Capital, Ltd.*

*v. Republic of Argentina*, No. 12-105 (L) (2d Cir. Apr. 23, 2012).  Financial markets have most

commonly understood the second sentence "to protect a lender against the risk of legal

subordination in favor of another creditor," such as by creating unsecured debt ranking senior in

legal right of payment.  Br. of the United States as *Amicus Curiae* in Supp. of Reversal at 11,

*NML Capital, Ltd.*, *v. Republic of Argentina*, No. 12-105 (L) (2d Cir. Apr. 4, 2012) ("U.S. Br.")

(Ex. H).  And markets have overwhelmingly agreed on what it does not mean:  "a borrower does

not violate the *pari passu* clause by electing as a matter of practice to pay certain indebtedness in

preference to the obligations outstanding under the agreement in which this clause appears." *Id.*;

*see also* Br. of the United States as *Amicus Curiae* in Supp. of the Republic of Argentina's Pet.

for Panel Reh'g and Reh'g *En Banc*, *NML Capital, Ltd., v. Republic of Argentina*, No. 12-105

(L) (2d Cir. Dec. 28, 2012) ("U.S. En Banc Br.") (Ex. F).

   As plaintiffs note, the *pari passu* clause has been at issue "[f]rom the earliest

stages of this litigation," Pls. Br. at 31 n.8, which stems from the Republic's social, economic,

and financial crisis and its subsequent 2001 default on over $80 billion of unsustainable external

indebtedness, and the restructuring it announced immediately thereafter.  *See* Registration

Statement, Amend. No. 1 at 4 (Jan. 28, 2010) (the "Registration Statement") (Ex. M).  After a

Belgian court, at the urging of NML's parent company, adopted *ex parte* a novel interpretation of

the *pari passu* clause requiring Peru to pay its defaulted debt *pro rata* with its restructured debt,[4]

---

[4] *See Elliott Assocs. L.P. v. Banco de la Nacion*, General Docket No. 2000/QR/92 (Court of Appeals of Brussels, 8th Chamber, Sept. 26, 2000) (Ex. T).  Recognizing the destructive nature of the court's finding, Belgium subsequently passed a law making it impossible for a creditor to obtain such injunctions in the future.  *See* Rodrigo Olivares-Caminal, Legal Aspects of Sovereign Debt Repayment 306 (Sweet & Maxwell 2009).

the Republic anticipated that NML and other plaintiffs might improperly similarly seek to disrupt the Republic's planned debt restructuring.

The Republic thus moved in December 2003 for a declaratory order affirming the true meaning of the *pari passu* clause in order to preclude plaintiffs from invoking that provision when the Republic held its restructuring.  *See* Mem. of Law, *Macrotecnic Int'l Corp. v. Republic of Argentina*, No. 02 Civ. 5932 (TPG) (S.D.N.Y. Dec. 12, 2003), ECF No. 29.  The Republic argued, *inter alia*, that the res judicata and merger doctrines precluded plaintiffs' contract claims for payment in full on their defaulted debt after the Court had already entered judgments for precisely the same claim.  *Id.* at 27-29.  In response, NML, which had filed in November 2003 the first of what would ultimately become twelve actions against the Republic on its defaulted debt, argued that the *pari passu* clause required the Republic to pay its creditors "ratably."  *See* Letter from K. Reed to Judge Griesa at 5, *NML Capital, Ltd. v. Republic of Argentina*, No. 03 Civ. 8845 (TPG) (Jan. 14, 2004 S.D.N.Y.) (Ex. Q).[5]  However, based on plaintiffs' representation that they were not seeking *pari passu* "relief" then or at any time in the foreseeable future, *id.* at 2, the Court declined to rule on the issue, reasoning that no justiciable controversy existed.

Over six years later, after it had brought ten more actions, NML moved on October 20, 2010 for partial summary judgment based on its incorrect reading of the *pari passu* clause and for a "ratable payment" injunction.  By the time NML brought its *pari passu* motion:

- The Republic in 2005 had completed its global, voluntary exchange offer of new, performing bonds for 76% of its non-performing debt, or approximately $62.5 billion in principal amount, making it the largest sovereign debt restructuring in history at that time (the "2005 Exchange Offer").  *See*

---

[5] NML subsequently moved for entry of judgment in that action – which the Court granted – without raising a *pari passu* claim.  *See NML Capital, Ltd. v. Republic of Argentina*, No. 03 Civ. 8845 (TPG) (S.D.N.Y. Mar. 28, 2005), ECF No. 44.

Registration Statement at 4 (Ex. M).  The new debt was issued at a discount to the face value of the defaulted debt.

- NML and EM Ltd. had unsuccessfully attempted to disrupt the 2005 Exchange Offer, without raising the *pari passu* issue.  *See NML Capital, Ltd. v. Republic of Argentina*, No. 02 Civ. 3804 (TPG), 2005 WL 743086 (S.D.N.Y. Mar. 31, 2005), *aff'd sub nom.*, *EM Ltd. v. Republic of Argentina*, 131 F. App'x 745, 747 (2d Cir. 2005).

- Over five years had passed since the Republic had (i) enacted in February 2005 Law 26,017, the so-called "Lock Law,"[6] which prevented the Republic's Executive from unilaterally re-opening the 2005 Exchange Offer or otherwise settling with creditors holding defaulted debt, and (ii) begun servicing in June 2005 the Exchange Bonds issued in connection with its 2005 Exchange Offer. *See* Registration Statement at 4 (Ex. M).

- The Republic had (i) enacted in November 2009 Law 26,547 (which suspended the Lock Law to allow another exchange offer to take place),[7] and (ii) re-opened its 2005 Exchange Offer in 2010 (the "2010 Exchange Offer") to holders of eligible securities who had not tendered in 2005, resulting in owners of approximately $12.8 billion of old debt tendering into the offer and receiving new debt on terms similar to those received by participants in the 2005 Exchange Offer.[8]  With the consummation of the 2010 Exchange Offer, the Republic successfully restructured approximately 92% of its defaulted debt.  *See id*.

NML asserted that the Republic had violated the *pari passu* clause both when it enacted the Lock Law and Law 26,547, under the incorrect theory that that somehow constituted legal subordination of NML's debt, and also – contrary to the position of, *inter alia*, the United States and Federal Reserve – when the Republic made payments of interest to the Exchange Bondholders without paying NML full principal and interest on its defaulted debt, notwithstanding that no New York court or practitioner had ever endorsed that novel reading. *See* Mem. of Law in Supp. of the Mot. by NML Capital, Ltd. For Partial Summ. J. and for

---

[6] *See* Law 26,017, dated Feb. 9, 2005 (Ex. P).

[7] *See* Law 26,547, dated Nov. 18, 2009 (Ex. N).

[8] *See* Republic of Argentina, Annual Report (Form 18-K) (Oct. 1, 2010) at 17, *available at* https://www.sec.gov/Archives/edgar/data/914021/000090342309000873/roa-18k_1026.htm.

8

Injunctive Relief Pursuant to the Equal Treatment Provision at 14-16, *NML Capital Ltd., v. Republic of Argentina*, No. 08 Civ. 06978 (TPG) (S.D.N.Y. Oct. 20, 2010), ECF No. 230 (Ex. L).  To "remedy" this alleged breach, NML asked the Court for an injunction ordering the Republic to pay NML 100% of the principal and interest due on its bonds when the Republic made a single interest payment on its defaulted debt, and restraining the Republic from making the latter payment unless it made the former.

After a hearing on September 28, 2011, the Court held on December 7, 2011 that the Republic violated the *pari passu* clause when it enacted both the Lock Law and Law 26,547, and by "persisting in its refusal to satisfy its payment obligations currently due under NML's Bonds."  *NML Capital Ltd. v. Republic of Argentina*, No. 08 Civ. 06978 (TPG), 2011 WL 9522565, at *2 (S.D.N.Y. Dec. 7, 2011).  Two months later, after NML had renewed its motion for injunctive relief, the Court entered in both the three pre-judgment NML actions as well as several pre-judgment "me too" actions[9] – in which plaintiffs together purport to now hold over $1.6 billion in claims against the Republic – injunctions on the terms requested by NML.  *See*, *e.g.*, Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Feb. 23, 2012) (Ex. J).

The Second Circuit affirmed in October 2012 the Court's finding that the Republic had breached the *pari passu* clause, but rather than holding that any single act by the Republic constituted a breach, the Second Circuit ruled that it was "the *combination* of Argentina's executive declarations and legislative enactments" that had violated the provision. *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 260 (2d Cir. 2012) ("*NML I*")

---

[9] *See* Order, *Aurelius Capital Master, Ltd., et al. v. Republic of Argentina*, No. 09 Civ. 8757 (TPG) (S.D.N.Y. Dec. 13, 2011), ECF No. 164; Order, *Varela, et al. v. Republic of Argentina*, No. 10 Civ. 5338 (TPG) (S.D.N.Y. Dec. 13, 2011), ECF No. 44; Order, *Olifant Fund, Ltd. v. Republic of Argentina*, No. 10 Civ. 9587 (TPG) (S.D.N.Y. Feb. 23, 2012), ECF No. 26.

(emphasis added).[10]  With respect to the meaning of the clause, the Court of Appeals held that
"[t]he first sentence [of the clause] ('[t]he Securities will constitute . . . direct, unconditional,
unsecured, and unsubordinated obligations . . . .') prohibits Argentina, as bond *issuer*, from
formally subordinating the bonds by issuing superior debt." *Id*. at 259 (emphasis in original).
The court further ruled that "[t]he second sentence ('[t]he payment obligations . . . shall at all
times rank at least equally with all its other present and future unsecured and unsubordinated
External Indebtedness.') prohibits Argentina, as bond *payor*, from paying on other bonds without
paying on the FAA Bonds." *Id*. (emphasis in original).  The Second Circuit stated that the
Republic had breached the first sentence through "the issuance of other superior debt," including
by enacting the Lock Law, and had breached the second sentence through "the giving of priority
to other payment obligations," by paying the Exchange Bonds but not the 1994 FAA Bonds and
"[by the] Republic declar[ing] in its prospectuses" and SEC filings that it had "no intention of
resuming payments" and that it was "not in a legal . . . position to pay." *Id*. at 259-60 (internal
citations omitted).[11]

          Following a remand, in which the Court on November 21, 2012 entered amended
injunctions clarifying that the amount that the Republic must pay those plaintiffs when it services
its restructured debt is 100% of the principal, contractual interest, and statutory interest
outstanding on their bonds (the "Amended Injunctions"), the Second Circuit affirmed again.  *See*

---

[10] The Republic was joined on appeal by the United States Government and the New York Clearing House
Association, which each submitted *amicus* briefs in support of reversal.  *See* Br. for *Amicus Curiae* the Clearing
House Association L.L.C. in Supp. of Reversal at 4-5, *NML Capital, Ltd*. *v. Republic of Argentina*, No. 12-105 (L)
(2d Cir. Apr. 4, 2012) (Ex. I) (characterizing plaintiffs' *pari passu* interpretation as "a dramatic and disruptive
departure" from market understanding); U.S. Br. at 12 (Ex. H) ("market understanding has consistently reflected that
a borrower does not violate the *pari passu* clause by electing as a matter of practice to pay certain indebtedness in
preference to the obligations" subject to the clause (internal citation omitted)).

[11] At one point in its opinion, the Second Circuit appeared to hold in the alternative that the Republic's enactment of
the Lock Law breached the *pari passu* clause because it constituted "'legal subordination' of the FAA bonds to
others," *NML I*, 699 F.3d at 260, but elsewhere the court expressly stated that it did *not* rule that "'legislative
enactment' alone could result in a breach," *id.* at 264 n.16.

Amended February 23, 2012 Order ¶ 2, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Nov. 21, 2012) (Ex. G); *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 248 (2d Cir. 2013) ("*NML II*").  Two days after the Supreme Court denied the Republic's petition for *certiorari*, the Second Circuit on June 18, 2014 lifted its stay, and the Amended Injunctions went into effect.

      **B.**      **Plaintiffs Honero And Trinity File "Me Too" Motions For Partial Summary Judgment, Joining More Than 500 Plaintiffs Who Filed Similar Motions In February And March 2015**

      As the Republic had warned on multiple occasions would happen, since the Amended Injunctions went into effect, the Republic has been inundated with complaints from additional holdout creditors demanding that they also be granted injunctions preventing the Republic from servicing its Exchange Bonds unless they are paid 100% of the principal and interest due on their defaulted bonds.  *See, e.g.*, Pre-Judgment Plaintiffs Chart (Ex. A); Post-Judgment Plaintiffs Chart (Ex. B).  There is no dispute that it would be impossible for the Republic to make such payments to all of its holdout creditors, which together hold more than $15 billion in claims.

      Between February 3, 2015 and March 3, 2015, 526 plaintiffs brought 37 motions for partial summary judgment against the Republic that, like NML's October 2010 motion, and plaintiffs' motions here, seek a declaration that the Republic has breached the *pari passu* clause in the 1994 FAA.  (Those 526 plaintiffs, whose motions remain pending, like Honero and Trinity do not ask now for the injunctions they will inevitably demand if they prevail here, instead stating that they "propose[] that the appropriate remedy for Argentina's violations be determined in subsequent proceedings."  Pls. Br. at 1.)  The 37 groups of holdout creditors are comprised of:

(i) 498 individual plaintiffs who have already obtained final money judgments (or, with respect to three NML actions, have obtained summary judgment for past due principal and interest[12]) (the "Post-Judgment Plaintiffs").  Together, the Post-Judgment Plaintiffs hold judgments totaling over $5.3 billion, which could rise to approximately $6.5 billion with the inclusion of post-judgment interest; and

(ii) 28 individual pre-judgment plaintiffs who have initiated new actions against the Republic, seeking both *pari passu* relief *and* final money judgments on their purported holdings of 1994 FAA Bonds in the principal amount of nearly $70 million, without including millions more in interest (the "Original Pre-Judgment Plaintiffs").[13]

NML and the other "me too" plaintiffs argue – contrary to the Second Circuit's decision – that the Republic has violated the *pari passu* clause through any one of several individual, distinct acts, *each* of which, they say, is an independent and completed breach of that provision, including:  the passage of the "Lock Law," Pls. Br. at 6, the Republic's payment of interest to holders of Exchange Bonds, Pls. Br. at 7, and the passage of Law 26,547, Pls. Br. at 8. Pursuant to a scheduling order, the Republic filed its opposition to those plaintiffs' motions on March 17, 2015.  The Republic argued, *inter alia*, that the Post-Judgment Plaintiffs' motions should be rejected under the doctrines of res judicata and merger, and because the *pari passu* clause does not apply to judgment debt.  With respect to all of the plaintiffs, the Republic opposed on the grounds that they sought to exceed the scope of the Second Circuit's ruling, which in any event is contrary to the text of the *pari passu* clause and market practice and understanding of that provision.

---

[12] *See NML Capital, Ltd. v. Republic of Argentina*, No. 07 Civ. 1910 (TPG) (S.D.N.Y.) ("*NML IV*"); *NML Capital, Ltd. v. Republic of Argentina*, No. 07 Civ. 6563 (TPG) (S.D.N.Y.) ("*NML VI*"); *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 2541 (TPG) (S.D.N.Y.) ("*NML VII*").

[13] Including Honero and Trinity there are now 30 pre-judgment plaintiffs (the "Pre-Judgment Plaintiffs"). *See* Pre-Judgment Plaintiffs Chart (Ex. A).

Trinity and Honero separately filed and served complaints against the Republic on March 3, 2015 seeking substantially similar *pari passu* relief.  *See* Compl., *Honero Fund I, LLC v. Republic of Argentina*, No. 15 Civ. 1553 (TPG) (S.D.N.Y. Feb. 3, 2015), ECF No. 1 ("Honero Compl."); Aff. of Service, *Honero Fund I, LLC v. Republic of Argentina*, No. 15 Civ. 1553 (TPG) (S.D.N.Y. Feb. 3, 2015), ECF No. 8; Compl., *Trinity Investments Limited v. Republic of Argentina*, No. 15 Civ. 1588 (TPG) (S.D.N.Y. Mar. 4, 2015), ECF No. 1 ("Trinity Compl."); Aff. of Service, *Trinity Investments Limited v. Republic of Argentina*, No. 15 Civ. 1588 (TPG) (S.D.N.Y. Mar. 6, 2015), ECF No. 4.  Notwithstanding that the Republic's time to respond to their complaints does not expire until May 4, 2015, only one week later, on March 10, 2015, Trinity and Honero moved for partial summary judgment, joining the 28 Original Pre-Judgment Plaintiffs in seeking *pari passu* relief in their new actions against the Republic.  *See* Pre-Judgment Plaintiffs Chart (Ex. A).

Honero adds to the over $5.4 billion in pre- and post-judgment claims against the Republic brought by the 37 groups of plaintiffs between February 3 and March 3, 2015 its purported holdings of $712,000 and €3,159,000 of 1994 FAA Bonds, not including interest, which it argues the Republic must pay in full any time it makes a payment to the Exchange Bondholders.  In its action, Trinity purports to hold $5,467,077 of 1994 FAA Bonds, not including interest, which it also argues the Republic must pay in full any time it makes a payment to the Exchange Bondholders.  However, rather than submitting an ordinary course bank statement establishing its ownership of 1994 FAA Bonds, Trinity attached to its complaint a custodial letter purporting to be from Wilmington Trust that appears to have been prepared for use in this litigation.  *See* Trinity Compl., Ex. B.

**ARGUMENT**

It is well-settled that a district court may not grant summary judgment unless, "in light of the undisputed facts, 'the movant is entitled to judgment as a matter of law.'" *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (quoting Fed. R. Civ. Pr. 56(c)(2)).  For the reasons set forth below, plaintiffs' motions fail as a matter of law and must be denied.

## I.   PLAINTIFFS' MOTIONS ARE PREMATURE

Plaintiffs' motions for partial summary judgment must be denied as premature, because the Republic has not been afforded the time allotted under Section 1608 of the Foreign Sovereign Immunities Act ("FSIA") to respond to plaintiffs' complaints.

While Federal Rule 56(b), which governs the timing of summary judgment motions, does not state an exact date on which a plaintiff may first file such a motion, courts have consistently held that they may not be filed until the non-moving party has had an opportunity to respond to the complaint.  *See Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, 23 F. Supp. 3d 173, 189 (S.D.N.Y. 2014) ("[C]ourts have denied pre-answer motions for summary judgment that seek a premature adjudication of a claim notwithstanding any technical compliance with the timing provisions of Rule 56."); *Cusamano v. Alexander,* 691 F. Supp. 2d 312, 321 (N.D.N.Y. 2009) ("Plaintiff's cross-motion for summary judgment is premature because defendants have yet to file an answer to the amended complaint"); *Cole v. Fischer*, No. 08 Civ. 699, 2009 WL 2258341, at *2 (W.D.N.Y. July 29, 2009) (denying summary judgment motion because, *inter alia*, answer had not been filed).

This line of authority is consistent with the Rule 56's commentary, which states, *inter alia*, that "in many cases the motion will be premature until the nonmovant has had time to file a responsive pleading."  Fed. R. Civ. P. 56 advisory committee's note, subdivision (b) (2010).  To the extent that the commentary suggests that some cases may warrant the filing of

14

premature summary judgment motions, courts have made clear that there is no reason that that exception should extend to FSIA actions against foreign sovereigns. *Silver Star Enters., Inc. v. M/V SARAMACCA*, No. Civ. A. 92-1297, 92-2802, 92-3077, 1992 WL 348420, at *2 (E.D. La. Nov. 18, 1992) (citing 28 U.S.C. § 1608(e)), *aff'd sub nom., Silver Star Enters., Inc. v. Suriname*, 55 F.3d 633 (5th Cir. 1995) (If Rule 56 "were strictly applied in the context of a suit against a foreign state, summary judgment could be filed . . . and decided before the time to answer had expired; in effect, a *de facto* default judgment.  This would run afoul of the FSIA's cautious view of default judgments.")

Here, because the Republic is a foreign state, it is afforded 60 days after plaintiffs' March 3, 2015 service of their complaint – *i.e.*, until May 4, 2015 – to file a responsive pleading, and no summary judgment motions may be filed before then.  28 U.S.C. § 1608(d) ("In any action brought in a court of the United States or of a State, a foreign state . . . shall serve an answer or other responsive pleading to the complaint within sixty days after service has been made under this section.").  Plaintiffs' filing of their motions for summary judgment *only seven days after service* on March 10, 2015 – more than seven weeks before the Republic's responsive pleading is due – is thus plainly premature and must be denied.  Should plaintiffs still wish to pursue the same relief after the Republic files a response to their complaints on May 4, plaintiffs may re-file their motions then.

Notwithstanding the premature nature of plaintiffs' motions, the Republic opposes them on the merits here to prevent plaintiffs from arguing that the Republic has waived its rights, which it otherwise reserves.

## II. TRINITY'S MOTION MUST BE DENIED BECAUSE TRINITY HAS NOT ADEQUATELY DEMONSTRATED ITS PURPORTED OWNERSHIP OF INTERESTS IN 1994 FAA BONDS

The Court must also deny Trinity's motion because Trinity has failed to present sufficient evidence that it owns the bonds at issue in its action.  The bank custodial letter attached as Exhibit B to Trinity's complaint, and submitted by Trinity as proof of beneficial ownership of 1994 FAA Bonds, is inadmissible because it is not an account statement that the bank issued in the normal course of business.  *See* Trinity Compl., Ex. B.  Unlike authenticated, ordinary course account statements, which fall under the "business records" exception to the hearsay rule, Fed. R. Evid. 803(6), Trinity's letter was plainly prepared for the purpose of this litigation and thus no hearsay exception applies.  *See* Fed. R. Civ. P. 56(e) (summary judgment should be supported by non-hearsay affidavits); Fed. R. Evid. 801(c) (defining hearsay); *see also Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994) ("Data prepared or compiled for use in litigation are not admissible as business records.").

Trinity's motion is accordingly unsupported by any valid proof that Trinity owns the bond interests it purports to hold, and must therefore be denied.

## III. PLAINTIFFS ARE NOT OTHERWISE ENTITLED TO THE SUMMARY JUDGMENT ORDERS THEY SEEK

### A. Plaintiffs' Motions Must Be Denied To The Extent They Exceed The Second Circuit's Prior Rulings In This Litigation

In its October 2012 opinion affirming the Court's finding that the Republic was in breach of the *pari passu* clause, the Court reasoned that its decision would not have an overly destructive effect on future sovereign debt restructurings in part because its ruling that the Republic breached the provision relied on the Republic's "entire course of conduct here," *NML I*, 699 F.3d at 264 n.16, including the aggregate "combination of Argentina's executive declarations and legislative enactments," *id.* at 260.  To avoid any ambiguity, the Second Circuit

16

expressly stated that it did *not* hold that any single payment to the Exchange Bondholders without a "ratable" payment to plaintiffs was a breach of the *pari passu* clause, *NML I*, 699 F.3d at 264 n.16, or that "'legislative enactment' alone" could breach the provision. *Id.* This limited ruling was consistent with *NML's own position* in the Second Circuit, where it stated to the Court of Appeals that this Court in its prior *pari passu* orders had "never held that a 'single payment' could violate the [*pari passu* clause]." Corrected Joint Resp. Br. of Pls.-Appellees, NML Capital, Ltd., Olifant Fund, Ltd., and Varela, et al. at 37, *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105(L) (2d Cir. Apr. 23, 2012); *see also id.* at 32 ("The district court did not address whether the [*pari passu* clause] could be violated by a single payment . . . . The district court instead looked to the case before it – which did not involve a 'single payment' – and held that" Argentina's conduct violated the provision).

Notwithstanding NML's prior position to the contrary and the plain language of the Court of Appeals, which makes clear that individual Republic payments to Exchange Bondholders and the Republic's enactment of a single law do not constitute breaches of the *pari passu* clause under the court's decision, plaintiffs now ask this Court to make those precise erroneous findings. Specifically, plaintiffs ask the Court to declare – in direct contradiction to the Second Circuit's ruling – that "each discriminatory payment [to the Exchange Bondholders] constitutes a separate, actionable breach of the Clause," Pls. Br. at 21; *see also* Honero Compl. ¶¶ 84-87 (alleging that the Republic's past and continuing payments of interest to the Exchange Bondholders "violated" or "will be a continuing violation of the Equal Treatment Provision of the FAA"); Trinity Compl. ¶¶ 105-08 (same), and that various individual laws, including the so-called Lock Law, "subordinated the rank" of plaintiffs' bonds in breach of the provision, Pls. Br. at 23; *see also* Honero Compl. ¶ 31 ("The Republic violated the Equal Treatment Provision of

17

the FAA by lowering the rank of its payment obligations under Honero's bonds below that of other unsecured and unsubordinated External Indebtedness by relegating Honero's bonds to a non-paying class pursuant to [the Lock Law]."); Trinity Compl. ¶ 34 (same). The Court should reject plaintiffs' attempt to improperly exceed the scope of the Second Circuit's ruling.

For all of the reasons stated in this litigation in the prior briefing of the Republic and the United States, among others, plaintiffs' theory that a single payment on restructured debt or that the enactment of a single law could violate the *pari passu* clause is contrary to New York law and United States policy, and as the Second Circuit recognized, would threaten the sustainability of sovereign debt restructurings going forward.[14] *See* Mem. of Law in Opp'n to Pl.'s Mots. for Partial Summ. J. and for Injunctive Relief Pursuant to the *Pari Passu* Clause at 18-31, *NML Capital Ltd., v. Republic of Argentina*, No. 08 Civ. 06978 (TPG) (S.D.N.Y. Dec. 10, 2010) (Ex. K); U.S. Br. at 10-21 (Ex. H); *see also* U.S. En Banc Br. at 1-5 (Ex. F).[15] As the Republic has previously noted, plaintiffs' erroneous theory, Pls. Br. at 26, relies on a law professor's declaration – submitted in *ex parte* proceedings in Belgium – that cited no relevant caselaw, would have been inadmissible in a New York court, and is directly contradicted by the views of expert practitioners who were responsible for drafting sovereign debt agreements with *pari passu* clauses. *See* Troland Link Decl. ¶ 15, *LNC Invs. LLC v. Republic of Nicaragua*, Folio 2000 1061, R.K. 240/03 (Commercial Ct. of Brussels) (Ex. R). Just as this Court and the Second Circuit declined to adopt this aspect of plaintiffs' incorrect theory in connection with the prior *pari passu* orders, the Court should do so again here.

---

[14] Although limited in this respect, the Second Circuit's ruling has endangered future sovereign debt restructurings in a material way.

[15] Rather than repeat all of the Republic's and United States' arguments showing the impropriety of plaintiffs' theory, the Republic attaches the relevant briefing as Exhibits K, H, and F.

**B.     The Republic's Arguments Are Not Barred By Collateral Estoppel**

Contrary to plaintiffs' assertion, Pls. Br. at 17-20, the Republic is not barred by collateral estoppel from contesting plaintiffs' attempt to overreach beyond the Second Circuit's decision.  As plaintiffs acknowledge, collateral estoppel only prevents a party from challenging the entry of an order where, *inter alia*, "the issues in both proceedings are *identical*."  *Id.* at 17 (citing *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (emphasis added)). Here, the issues now before the Court are clearly not "identical" to those determined in prior proceedings, as plaintiffs ask the Court to greatly expand the breadth of its prior *pari passu* orders in a manner not contemplated by the Court of Appeals.  *See Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir. 1991) ("Issues that may bear the same label are nonetheless not identical if the standards governing them are significantly different."). The Republic is accordingly not collaterally estopped from opposing plaintiffs' pending motions, which must be rejected to the extent they exceed the Second Circuit's ruling.[16]

**C.     The Republic Has Not Breached The *Pari Passu* Clause As It Has Long Been Understood By The Market**

Separate and apart from the foregoing deficiencies, the Court should deny plaintiffs' motions in their entirety because the Republic has not breached the *pari passu* clause under the provision's true meaning.  Notwithstanding the prior rulings in this litigation, the Republic maintains – in the absence of any New York State court ruling on the issue at all, let alone a binding decision by the New York Court of Appeals – that the Second Circuit's reading of the *pari passu* clause runs contrary to New York law and market understanding both here and abroad (including the views of the IMF and the United Nations).

---

[16]  To the extent plaintiffs raise new arguments that certain alleged Republic acts constitute violations of the *pari passu* clause, *see, e.g.,* Pls. Br. at 18 (arguing, for the first time, that the Republic's enactment of Law Nos. 26,886 and 26,984 violated plaintiffs' *pari passu* rights), the Republic is certainly not collaterally estopped from challenging those claims.

As made clear by the submissions of not only the Republic, but also the United States, France, Brazil, Mexico, Professor Joseph Stiglitz, former IMF Deputy Director Anne Krueger, and the New York Clearing House Association – among many others – the *pari passu* clause, as it had always been understood prior to this Court's ruling, prohibits only a creditor's involuntary legal subordination of debt that is subject to the clause to certain of the creditor's other indebtedness. *See* Br. for the Republic of France as *Amicus Curiae* in Supp. of the Republic of Argentina's Pet. For a Writ of Cert. at 1, *Republic of Argentina v. NML Capital, et al.*, No. 13-990 (Mar. 24, 2014) ("[T]he well-settled mainstream market understanding [is] that a *pari passu* clause does not covenant that all payments will be made by a borrower ratably with the borrower's other unsubordinated debts, but rather provides protection against legal subordination of claims only[.]") (Ex. D); Br. of the Federative Republic of Brazil as *Amicus Curiae* in Supp. of Pet'r at 6, *Republic of Argentina v. NML Capital, et al.*, No. 13-990 (Mar. 24, 2014) ("[P]articipants in sovereign bond markets, including Brazil, have long understood *pari passu* clauses to protect bondholders solely from legal subordination[.]"); Br. of the United Mexican States as *Amicus Curiae* in Supp. of Pets. for Writs of Cert. at 2, *Republic of Argentina v. NML Capital, et al.*, No. 13-990 (Mar. 24, 2014) (characterizing the Second Circuit's interpretation of the *pari passu* clause as "unprecedented" and stating that it results in "increasing holdout leverage, [ ] creating incentives for holdouts to pursue windfall profits at the expense of exchange offer participants, and [ ] discouraging exchange offer participation for fear that holdouts will be able to interrupt the payment of restructured debt"); Br. of Joseph Stiglitz as *Amicus Curiae* in Supp. of Pet'r at 5-6, *Republic of Argentina v. NML Capital, et al.*, No. 13-990 (Mar. 24, 2014) (while *pari passu* clauses have "long been [ ] standard term[s] in sovereign debt contracts," the Second Circuit's interpretation of them is novel and "will have a severely

negative impact on the public interest, in this case and in a wide array of sovereign debt restructurings, past and future"); *see also* Br. for *Amicus Curiae* Professor Anne Krueger in Supp. of the Republic of Argentina and Reversal at 11-16, *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105 (L) (2d Cir. Jan. 4, 2013) (Ex. E); Br. for *Amicus Curiae* the Clearing House Association L.L.C. in Supp. of Reversal at 4-5, No. 12-105 (L) (2d Cir. Apr. 4, 2012) (Ex. I).

　　　　No such involuntary subordination has occurred here, including with respect to the Exchange Bonds.  Plaintiffs elected *voluntarily* not to participate in the Exchange Offers that they now claim produced a preferred class of creditors, and the fact that plaintiffs have not been paid and that the Republic has made statements to that effect is not, and has never been considered to be, a "subordination" of creditor rights.

　　　　The Second Circuit's erroneous ruling to the contrary stems from a false distinction that the Court made between the *pari passu* clause's two sentences:

> The first sentence ("[t]he Securities will constitute . . . direct, unconditional, unsecured, and unsubordinated obligations . . . .") prohibits Argentina, as bond *issuer,* from formally subordinating the bonds by issuing superior debt.  The second sentence ("[t]he payment obligations . . . shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness.") prohibits Argentina, as bond *payor,* from paying on other bonds without paying on the FAA Bonds.  Thus, the two sentences of the *Pari Passu* Clause protect against different forms of discrimination:  the issuance of other superior debt (first sentence) and the giving of priority to other payment obligations (second sentence).

*NML I*, 699 F.3d at 259 (emphasis in original).

　　　　Apart from contradicting market understanding and practice, that reading of the provision is unsupported by its plain language.  Notably, the Court omitted from its analysis of the first sentence the key language making clear that its "ranking" requirement applies only "*among [the 1994 FAA Bonds] themselves,*" and thus necessarily does not apply to the Republic

as "bond issuer" in connection with any *other* debt that the Republic might issue in the future.
1994 FAA ¶ 1(c) (Ex. U) (emphasis added).  With respect to the 1994 FAA Bonds alone, the
Republic plainly *did* rank them equally, as both the Republic's default and the terms of its
Exchange Offers applied equally to all FAA bondholders.  Thus, even if legislative acts and
declaratory statements concerning the non-payment of the 1994 FAA Bonds could constitute
"subordination" – which they cannot – there was no basis for the Second Circuit to hold that they
constituted a violation of the *pari passu* clause here simply because *other* later-issued debt, *i.e.*,
Exchange Bonds, were not subject to similar legislative acts and statements.

　　　　　Nor is there any basis for the Second Circuit's reading of the latter sentence –
which *does* concern other, non-FAA indebtedness – as barring Argentina from servicing its
Exchange Bonds.  The Second Circuit read the phrase "payment obligations" as indicating that
the second sentence addresses the Republic as bond *payor*, rather than as bond issuer, reasoning
that otherwise the court would have failed to give effect to the differences between the two
sentences.  *NML I*, 699 F.3d at 259.  But the distinction between the first and second sentences is
that they require equal ranking of different groups of indebtedness – 1994 FAA Bonds (first
sentence) and other External Indebtedness (second sentence), *not* that they address the Republic
in different capacities (bond *issuer* vs. bond *payor*).  The operative word in the second sentence
is plainly "rank," which makes clear that the clause bars the formal subordination of the 1994
FAA Bonds to certain other debt (which, as noted above, did not occur here) and is not, as the
Second Circuit wrongly held, a promise to pay on the 1994 FAA Bonds if the Republic makes
payments on other bonds.

　　　　　While the Second Circuit tried to limit the impact of its novel reading of the *pari
passu* clause by emphasizing that even plaintiffs argued that payments to multilateral institutions,

22

like the Paris Club, would not violate the provision because the market understands them to be

preferred creditors, *id.* at 260, it could not undo the broader harm of its ruling.  Neutral observers

around the world have recognized that the Court's interpretation of the provision is erroneous

and threatens the stability of sovereign debt restructurings going forward.  For example, in an

October 2014 report focusing on the market's concern about the Amended Injunctions, the IMF

observed that "[t]he general reaction to the New York Court Decisions demonstrates that a wide

array of commentators and interested parties have concerns that these decisions may, in fact,

have a broad impact on the restructuring process."  *See* IMF, *Strengthening the Contractual*

*Framework to Address Collective Action Problems in Sovereign Debt Restructuring* 12 (Oct. 1,

2014).  The IMF explained:

> [S]ince the type of remedy provided to the holdout creditors in the New York
> Court Decisions enhances the leverage of holdouts, these decisions have increased
> the risk that holdouts will multiply, as they now have the ability to extract a
> preferential recovery outside of a debt exchange. . . . In addition, because the New
> York Court Decisions increase the risk that holdout creditors will be able to
> interrupt the flow of payments to [restructuring creditors], there would be an even
> greater disincentive for creditors to participate in the restructuring.

*Id.* at 11-12.

Separately, the United Nations General Assembly recently sought to limit the

Amended Injunctions' impact and to reaffirm international practice by passing a resolution,

supported by 124 nations, aimed at preventing such orders from being entered again.  The

express goal of the resolution is to "adopt through a process of intergovernmental negotiations

. . . a multilateral legal framework for sovereign debt restructuring processes with a view . . . to

increasing the efficiency, stability and predictability of the international financial system."  *See*

G.A. Res. 68/304, U.N. Doc. A/RES/68/304 (Sept. 17, 2014) (Ex. C).  Even if plaintiffs were

otherwise entitled to the order they seek, the Court should therefore decline their invitation to

enter yet more orders that threaten additional harm to the Republic, third parties (including the Exchange Bondholders), and the broader system of debt restructuring.

Apart from their destructive nature, such orders would not be productive in bringing about a resolution of this litigation even in plaintiffs' view, as unlike the Court's prior orders, they would not be enforceable through specific performance injunctions because plaintiffs would not be able to establish the requisite equitable basis. *See Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 211 (2d Cir. 2012) ("[I]t must be likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." (citation omitted)). The Court reasoned that the prior injunctions compelling the Republic to pay plaintiffs in certain actions 100% of the principal and interest owed to them were equitable because the Republic "ha[d] the financial wherewithal" to both make that payment and service its restructured debt. Order at 3, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Feb. 23, 2012) (Ex. J). But while plaintiffs there may have been able to plausibly argue that the Republic could afford to pay them the approximately $1.6 billion they claimed to be owed, Honero, Trinity, and the other "me too" plaintiffs plainly cannot make that same showing in connection with the more than $5.4 billion they will demand on top of that $1.6 billion.

The Republic's reserves currently stand at approximately $31 billion. No sovereign, including the Republic, can afford to deplete by 25% its fiscal reserves – which must be used for critical macroeconomic purposes – without exposing its economy to significant hardship. Thus, even if summary judgment were warranted here – which it is not – plaintiffs' motions should still be denied because any such orders would not be enforceable by injunction and would not lead to the resolution of these litigations that all parties and the Court desire.[17]

---

[17] Plaintiffs cite to the law of the case doctrine. *See* Pls. Br. at 20 n.6. Even if the doctrine applied here – which it does not – the current motions, which join 37 others and thus could result in demands for an additional payment of

Rather, they would only reward plaintiffs' disruptive holdout strategy and make it substantially more difficult for sovereigns facing financial crisis in the future from successfully following universally accepted norms and voluntarily restructuring their debts.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion should be denied.

Dated:  New York, New York
        March 27, 2015

                            Respectfully submitted,

                            CLEARY GOTTLIEB STEEN & HAMILTON LLP


                            By: __/s/ Carmine Boccuzzi_____
                                Jonathan I. Blackman (jblackman@cgsh.com)
                                Carmine D. Boccuzzi (cboccuzzi@cgsh.com)

                            One Liberty Plaza
                            New York, New York 10006
                            (212) 225-2000
                            Attorneys for the Republic of Argentina

Of Counsel:

Elizabeth C. Block
Michael M. Brennan
Elizabeth M. Hanly

---

over $5.4 billion by the Republic, must be denied to "prevent manifest injustice."  *See Johnson v. Holder*, 564 F.3d 95, 100 (2d Cir. 2009).